**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3172-23

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

KHALIL A. HOWARD,

    Defendant-Appellant.

_____

Argued April 14, 2026 – Decided June 30, 2026

Before Judges Gooden Brown and Torregrossa-O'Connor.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Indictment No. 22-08-2014.

Alexandra Marek, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Alexandra Marek, of counsel and on the briefs).

Matthew E. Hanley, Assistant Prosecutor, argued the cause for respondent (Theodore N. Stephens, II, Essex County Prosecutor, attorney; Matthew E. Hanley, of counsel and on the brief).

PER CURIAM

At 12:55 a.m. on May 19, 2022, Newark police responded to a 9-1-1 call to find victims S.F. and J.M.[1] lying on the floor of their apartment, each bleeding from multiple stab wounds. Defendant Khalil A. Howard admitted he stabbed both women during an earlier altercation after spending the evening with S.F., but claimed he acted in self-defense.[2] Subsequently, a grand jury charged defendant with first-degree attempted murder of S.F., "an ex-girlfriend," a crime of domestic violence, N.J.S.A. 2C:25-19 and N.J.S.A. 2C:5-1(a)(1), N.J.S.A. 2C:11-3(a)(1), (2) (count one); fourth-degree unlawful possession of a weapon (knife), N.J.S.A. 2C:39-5(d) (counts two and five); third-degree possession of a weapon (knife) for an unlawful purpose, N.J.S.A. 2C:39-4(d) (counts three and six); and second-degree aggravated assault of J.M., N.J.S.A. 2C:12-1(b)(1) (count four). A jury found defendant not guilty of attempted murder, but guilty of the lesser-included offense of aggravated assault as to S.F., and guilty on all

---

[1] We use initials to protect the domestic violence victim's privacy. R. 1:38-3(c)(12).

[2] On July 5, 2023, defendant filed a notice of affirmative defenses prior to trial, advising he intended to "rely on the defense of the use of force for self-protection at the time of trial."

remaining counts. Defendant was sentenced to an aggregate term of seven years

subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2.[3]

On appeal, defendant raises the following points for our consideration:

POINT I

THE TRIAL COURT'S FAILURE TO INSTRUCT THE JURY ON SELF-DEFENSE AS APPLIED TO S.F. AND THE WEAPON-POSSESSION OFFENSES DEPRIVED [DEFENDANT] OF A FAIR TRIAL.

A. The Trial Court's Failure to Instruct the Jury On Self-Defense As Applied To S.F. Violated [Defendant]'s Right To A Fair Trial.

B. The Trial Court Failed to Specifically Instruct The Jury On Self-Defense As Applied To The Unlawful Possession Of A Weapon Offenses.

C. The Trial Court Failed To Instruct The Jury On The Specific Self-Defense Instruction As Applied To The Charges Of Possession Of A Weapon For An Unlawful Purpose.

POINT II

THE AGGRAVATED ASSAULT CONVICTIONS MUST BE REVERSED BECAUSE THE TRIAL

---

[3] Defendant was sentenced to seven years subject to NERA on each of the two counts of aggravated assault, imposed concurrently, with the weapons charges merging respectively into either count. The sentence is not the subject of this appeal.

COURT FAILED TO ADEQUATELY ANSWER THE JURY'S QUESTIONS THAT INDICATED THEY DID NOT UNDERSTAND THE DIFFERENCE BETWEEN SERIOUS VERSUS SIGNIFICANT BODILY INJURY.

POINT III

THE ADMISSION OF HEARSAY TESTIMONY ABOUT WHAT A DOCTOR TOLD J.M. ABOUT HER INJURIES WAS PLAIN ERROR.

POINT IV

THE TRIAL COURT ERRED IN ADMITTING A TWELVE-MINUTE VIDEO LINGERING ON TRAUMATIC SCENES OF BLOOD IN VIOLATION OF RULE 403.

POINT V

THE CUMULATIVE EFFECT OF THE LEGAL ERRORS DENIED [DEFENDANT] OF A FAIR TRIAL.

Having considered these arguments in light of the record and applicable legal principles, we affirm.

I.

A.  The Offense and Trial

At the three-day trial, the State presented numerous witnesses, including both victims, S.F.'s daughter, two responding police officers, a medical expert, and the mother of defendant's children.  Evidence included medical records, the

4

knife, defendant's clothing and sneakers, photos of the scene and the victims' injuries, and police video of the scene on arrival. Defendant elected not to testify and presented no witnesses.

S.F. testified that she and defendant previously had a sexual relationship, but at the time of the offense were just friends. On the evening of May 18, defendant had been at S.F.'s apartment, where she resided with her daughter and J.M., before she asked him to leave, but he refused. Defendant had accompanied S.F. to her bedroom after cooking something to eat in the kitchen, and S.F. repeatedly requested he leave to no avail.

S.F. recalled at one point picking up her phone, after which defendant "charged" at her to "try[] to get [her] phone out of [her] hand," "tussling" with her, which caused her to fall to the ground. She testified she attempted to get him off her and recalled feeling defendant "hit [her] in the back." Unable to free herself, she called for J.M. to help.

S.F. testified, "When [J.M.] came in [defendant] was in front of me, I was still on the ground. [J.M.] came up from behind him with a choke hold." She described trying but being unable to get up, when she saw a knife, "silver with a black handle," on the floor which she "tossed" under her bed. She recalled seeing her daughter come to the doorway and yelling for her to leave as she saw

5

J.M. fall to the ground and "noticed that [J.M.] was bleeding from her . . . side." She described trying to help J.M. before defendant finally fled the apartment.

S.F. testified she received medical aid at the scene before being transported to the hospital where she remained for "about a week." She explained she suffered "a punctured kidney" requiring surgery; injuries to her arms and legs; and other wounds concentrated on the left side of her body. Describing scarring that remains from her injuries and her continuing treatment, S.F. clarified she did not realize she was stabbed until after the attack. She also identified photos of her injuries, her apartment, and defendant's car.

S.F. acknowledged she hypothesized in prior statements that there may have been two knives involved in the altercation, but testified she only recalled one knife, silver with a black handle. She was aware investigators found the silver and black knife in the sink, but testified she did not know how it got there after the attack. She explained there was only one green knife, borrowed from a neighbor, that was ever used in the apartment and insisted the silver knife with a black handle was not hers.

Q.L., S.F.'s teenage daughter, testified and recalled hearing a "thump" and "arguing" coming from S.F.'s room. She described proceeding to her mother's

6

room, where she saw "[her] mom on the floor and [defendant] on top of [her] mom," with J.M. "trying to help [her] mother."

Dr. Nina Glass was qualified as a medical expert and testified she performed emergency surgery on S.F. the night of the altercation. Dr. Glass described S.F. had "multiple stab wounds" to her legs, arm, abdomen, and back and "had enough of a blood loss to be in shock" which would mean S.F. "lost [forty] percent of [her] blood volume" or about "[two] liters." She described one "stab wound had gone through [the] abdominal wall and into [S.F.'s] . . . abdominal cavity" injuring a kidney. The doctor indicated S.F. "could have died" from her injuries without immediate treatment.

J.M. testified she was in her room on the night of the attack when she heard S.F. call her name and "a big boom," which was "[l]ike a loud bump, like somebody fell" and ran towards S.F.'s bedroom. J.M. described observing S.F. "on the floor in the corner" with defendant "on top of her . . . punching on her." She recalled trying to "d[o] [her] best to try to get him off her." Specifically, she stated:

> [O]nce I entered the room I went behind [defendant] trying to yank him off her. He wouldn't move because he was strong. And I tried punching on him to get him off. Then he turns and he start hitting on me. Once he hit me on my face I fell down . . . [a]nd once he got on top of me he was punching me on my stomach. Once

7

> [S.F.] finally made it up to get up to try to help that's when, as he was turning I seen a sharp . . . object coming from his sleeve by his . . . right wrist. . . . It's like as if the knife was sliding down. Like you know how you tuck something in your sleeve and then something is like sliding down.

She described she and S.F. tried to fight off defendant as he punched her "three times in the stomach and two times to the face," which she believed was when he stabbed her. J.M. indicated she did not see the knife until after she fell to the ground. J.M. recalled attempting to get to the kitchen, and only then realizing she had been stabbed, "collaps[ing]" due to her injuries. J.M. acknowledged she left a "blood trail" going into the kitchen before she fell to the floor.

J.M. described receiving "emergency surgery" the night of the altercation due to internal bleeding. She indicated she needed surgeries "to stitch up [her] lip" and "stomach." She identified a series of photos taken of her while she was in the hospital depicting her injuries. She described the "lingering effects" of her injuries as permanent irregular bowel movements and lasting scars. She testified her doctor advised she had been stabbed and "the knife was shifted three times, and it punctured [her] fascia the lining of [her] stomach and it caused internal bleeding." She also indicated the doctor advised her bowel irregularity was "a permanent situation."

A-3172-23

S.L., the mother of defendant's children, testified defendant came to her residence on the night of the incident "covered in blood" and "[v]ery uptight and anxious." She described asking defendant what happened before "he said that he stabbed two different people" after "an argument happened, and it turned very nasty." She testified defendant told her:

> One person jumped on his back or something like that and I guess he had to fight them off, and things of that nature.
>
> Whoever he was having a dispute with, another person jumped on his back. And so now he was being attacked by another person. And apparently whatever happened those two people got stabbed.

S.L. also recalled helping defendant clean his "bloody and cut" hands before going to sleep for the night. When she arrived at work later that morning, she informed her friends and coworkers what had happened and they helped her call the police.

Various law enforcement witnesses testified about responding to and investigating the offense. In the victims' residence responders found both victims on the floor with S.F. in the living room and J.M. in the kitchen. Blood was "all over the floor" in both the living room and kitchen and "a kitchen knife, [with] black handle, silver blade and specks of blood on it" with a "bent" tip "in the kitchen sink." Law enforcement did not find any knife under the victim's

9

bed. Police then arrested defendant and secured bloody clothing within his residence matching the description from the victim. Police additionally located blood on the seats and steering wheel of his car. No blood was ever tested for D.N.A.

Over defendant's objection, the court admitted and the State played for the jury an edited twelve-minute audio-less clip of a responding officer's body worn camera (BWC) footage. The video depicted attempts by first responders to locate and compress S.F.'s stab wounds before transport to the hospital. Defendant objected to the length of the video, arguing the video "linger[ed]" on the bloody scene and was unfairly prejudicial. In admitting the already-shortened video, the court found "the length" was not "overly prejudicial," given the officer was "continuously throughout the video rendering aid to different parts of [S.F.]'s body."

At the charge conference, defendant, requested a self-defense instruction as to both victims. Defendant contended a self-defense charge was warranted, asserting a jury could find the victims, acting jointly, overpowered him, and J.M. brought the knife into the melee. Defendant cited S.L.'s testimony regarding his statements in the aftermath as sufficient to raise the defense that he acted in self-protection during the encounter. Defendant did not explicitly request a self-

defense charge related to the weapons offenses. The State objected, asserting there was no evidence in the record supporting self-defense, and S.L.'s hearsay testimony was mischaracterized by defendant and nonetheless insufficient to raise the defense.

The court denied the request as to the attempted murder of S.F., but determined a rational basis existed to instruct the jury as to self-defense for the aggravated assault charge related to J.M. After summarizing the testimony, the court relied heavily on S.L.'s testimony characterizing what defendant told her.

The court concluded, based on the evidence, "there [wa]s enough for the jury to make a determination as to if [defendant] had to use self[-]defense," but only as to J.M. because S.L. indicated defendant "was in an argument with someone and they were in a physical altercation and someone else came in and jumped on his back." The court found S.L.'s testimony was consistent with the testimony of both victims, and did not find there was "any sort of evidence" to sufficiently suggest "he had to use self[-]defense against [S.F.]" It noted S.F. testified she repeatedly asked defendant to leave and he refused and "there was nothing from . . . [S.L.'s] testimony to suggest that . . . [S.F.] was aggressive with him first."

B. <u>Jury Instructions and Verdict Sheet</u>

The court then instructed the jury, without objection from the parties and consistent with the model criminal jury charges, as to each offense charged, lesser-included offenses, and the defense of self-defense only as to the aggravated assault charge concerning J.M.

Relevant here, the court provided the model charges defining "serious bodily injury" and "significant bodily injury," as well as self-defense. Specifically, the court instructed the jury could consider self-defense only related to the alleged attack on J.M. Specifically, the court charged in relevant part as follows:

> [I]n this case, I'm instructing you on what self-defense means, but this is only with respect to [J.M.], okay? So, with me reading this charge, it's only for your consideration regarding the charges involving [J.M.]
>
> The indictment charges that the defendant has committed the crime of aggravated assault against [J.M.] The defendant contends that if the State proves he used or threatened to use force upon another person that such force was justifiable for his self[-]protection.
>
> The use of force upon or toward another person is justifiable when the actor reasonably believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion.

12

The court then instructed the jury how to proceed through the verdict form, explaining the jurors would only proceed to questions pertaining to lesser-included offenses should they find defendant was not guilty of the larger, overarching offense.

Pertinent to this appeal, the final verdict form read:

COUNT ONE:

ATTEMPTED MURDER

1a. On May 18, 2022, in the City of Newark, in the County of Essex, the defendant, did purposely attempt to cause the death of [S.F.].

Our verdict is:

Not Guilty _____ Guilty _____

If you find the defendant GUILTY move on to Count Two, if you find him NOT GUILTY then move to Question 1b.

Aggravated Assault – Cause/Attempted to Cause Serious Bodily Injury

1b. On May 18, 2022, in the City of Newark, in the County of Essex, the defendant purposely or knowingly caused or attempted to cause serious bodily injury to [S.F.].

Our verdict is:

Not Guilty _____ Guilty _____

If you find the defendant GUILTY move on to Count Two, if you find him NOT GUILTY then move to Question 1c.

13

<u>Aggravated Assault – Significant Bodily Injury to a Victim of Domestic Violence</u>

1c. On May 18, 2022, in the City of Newark, in the County of Essex, the defendant attempts to cause or purposely or knowingly, causes significant bodily injury to [S.F.], a former romantic partner.

Our verdict is:

Not Guilty _____ Guilty _____

. . . .

<u>COUNT FOUR:</u>

<u>AGGRAVATED ASSAULT – CAUSE/ATTEMPTED TO CAUSE SERIOUS BODILY INJURY</u>

4a. On May 18, 2022, in the City of Newark, in the County of Essex, the defendant purposely or knowingly caused or attempted to cause serious bodily injury to [J.M.].

Our verdict is:

Not Guilty _____ Guilty _____

If you find the defendant GUILTY move on to Count Five, if you find him NOT GUILTY then move to Question 4b.

<u>Aggravated Assault – Significant Bodily Injury</u>

4b. On May 18, 2022, in the City of Newark, in the County of Essex, the defendant attempts to cause or purposely or knowingly, causes significant bodily injury to [J.M.].

Our verdict is:

Not Guilty _____ Guilty _____

14

## C. Jury Questions

Shortly after deliberations commenced, the jury sent three questions to the court pertinent to this appeal. The first queried, "If this was a domestic relation, do we have to go to 1(c)?" The court conferred with counsel and advised, "So, if they're asking about 1(c) my response to them is you're only supposed to be at that question if you answered not guilty to question 1(a) and 1(b)." Both attorneys consented to that instruction.

The jury's second question inquired, "Does relationship status define 1(b) versus 1(c)[?]" The court stated it would advise,"[the jury] can only be thinking about that if they're at question 1(c)." Both parties and the court agreed the "level of injury" was the "main difference" between the offenses, and that it was less about relationship status.

The jury's third inquiry asked, "What is the distinction between 4(a) and 4(b)?" as to aggravated assault. Without objection, the court advised counsel it would instruct the jury it had explained "what serious bodily injury is . . . [a]nd that a less[e]r included of that is significant bodily injury and [it] explained that" and remind the jury it could refer back to the initial charge if it wanted.

The court advised the jury of the agreed-upon responses. Subsequently, after approximately nine-and-a-half hours of deliberation over the course of

15

three days, the jury reached a verdict finding defendant not guilty of attempted murder of S.F., but guilty on the lesser-included offense of aggravated assault and all five remaining counts. This appeal followed.

## II.

### A.

On appeal, defendant first argues the trial court erroneously failed to instruct the jury on self-defense as to S.F., alleging the record provided a rational basis for the charge and deprived defendant of his only defense to the charge and, thus, his right to a fair trial. He contends S.L.'s testimony recounting defendant's statements, as well as defendant's smaller size, amounted to sufficient evidence warranting the self-defense charge as to S.F. We are not persuaded.

In reviewing whether a defendant was improperly denied a self-defense instruction, this court must consider whether "the evidence, viewed most favorably to the defendant, would support that justification, . . . focus[ing] on 'the evidence that provides a rational basis for a self-defense charge.'" State v. Gentry, 439 N.J. Super. 57, 63 (App. Div. 2015) (quoting State v. Rodriguez, 195 N.J. 165, 170 (2008)); see also State v. A.L.A., 251 N.J. 580, 595 (2022) ("When a party requests a specific instruction that is not given, reviewing courts

consider whether a rational basis for giving the instruction existed."). "The rational-basis test sets a low threshold." State v. Carrero, 229 N.J. 118, 128 (2017). It is not required that "[t]he trial evidence . . . compelled a conclusion that defendant acted in self-defense," only that "a jury could find that he acted in self-defense." Gentry, 439 N.J. Super. at 71.

It is well settled that when "'a self-defense charge is requested and supported by some evidence in the record, it must be given' at trial." State v. Macchia, 253 N.J. 232, 252 (2023) (quoting Rodriguez, 195 N.J. at 174). "[A] court should consider the circumstances that might give rise to that defense, including the defendant's and alleged aggressor's conduct" as "[t]he reality of the situation facing the defendant governs whether he had a right to engage in self-defense." Rodriguez, 195 N.J. at 174.

N.J.S.A. 2C:3-4 provides, "[T]he use of force upon or toward another person is justifiable when the actor reasonably believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion," and also provides limitations to this defense. The statute further states deadly force may be employed when "the actor reasonably believes that such force is necessary to protect himself against death or serious bodily harm." N.J.S.A. 2C:3-4(b)(2).

Here, defendant had no burden of proof, and the right not to testify, which he invoked. With that, the only injection of defendant's point of view into the trial record concerning the manner in which the stabbings occurred came in the form of the brief and general characterization by S.L. of defendant's statements to her in the aftermath. S.L. testified defendant arrived at her residence shortly after the encounter "covered in blood," and advised of "an argument" that "turned very nasty." She further summarized defendant's account as communicating only: "[W]hoever he was having a dispute with, another person jumped on his back. And now he was being attacked by another person. And apparently whatever happened those two people got stabbed." No further description of S.F.'s conduct, from defendant's perspective, is given beyond a "nasty" argument, precipitating J.M.'s jumping on defendant's back.

The jury in contrast heard and observed the testimony of S.F., J.M., and S.F.'s daughter. S.F. explained defendant refused to leave her home, and when she grabbed her phone, defendant "charged" at her, leading to her falling to the floor, where defendant struck her in the back before J.M. came to the room attempting to pry defendant off S.F. Her injuries and the remaining record were consistent with her account of what transpired. Indeed, there was nothing in the

18

State's case that buttressed defendant's claim S.F. attacked him in some way warranted his using force to strike and stab her.

We are satisfied the trial court correctly found the record, including S.L.'s hearsay summary of defendant's account of what occurred, failed to provide a rational basis to suggest S.F. initially employed "unlawful force" against defendant, precipitating his physical attack on her. Because the defense of self-defense requires some evidence defendant acted reasonably in "protecting himself against the use of unlawful force by such other person," we discern no error in the court's declining to instruct the jury on self-defense as to S.F.

B.

Next, concerning all of the weapons charges, under both N.J.S.A. 2C:39-5(d) and 2C:39-4(d), and as to both victims, defendant contends the trial court was required to instruct the jury that it could have found defendant not guilty if they found he justifiably armed himself in self-defense. Acknowledging he did not request such a charge to any of the weapons offenses, defendant argues the court should have sua sponte instructed the jury, and the omission was plain error. We are not convinced.

"When a defendant fails to object to an error or raise an issue before the trial court, we review for plain error" and "may reverse on the basis of

unchallenged error only if the error was 'clearly capable of producing an unjust result.'" State v. Ross, 229 N.J. 389, 407 (2017) (quoting R. 2:10-2). Specifically, "[t]he possibility of an unjust result must be 'sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached.'" State v. Williams, 168 N.J. 323, 336 (2001) (quoting State v. Macon, 57 N.J. 325, 336 (1971)). Defendants raising challenges on appeal not previously addressed to the trial court "bear[] the burden of establishing that the trial court's actions constituted plain error . . . because 'to rerun a trial when the error could easily have been cured on request, would reward the litigant who suffers an error for tactical advantage either in the trial or on appeal.'" Ross, 229 N.J. at 407 (quoting State v. Weston, 222 N.J. 277, 294-95 (2015)).

Unlawful possession of a weapon, N.J.S.A. 2C:39-5(d), "punishes possession, without considering intent." State v. Kelly, 118 N.J. 370, 380 (1990). Therefore, "self-defense rarely constitutes a defense to such a charge." Ibid. "If a person possesses an instrument for a legitimate purpose and makes immediate use of that instrument as a weapon in order to fight off an impending threat, then, and only then, is self-defense a justification to [this] offense." Id. at 381, 386 (noting nonetheless "self-defense should not generally cure the infraction of wrongful possession"). Thus, here, defendant would have been

20

justified in possessing the knife only if the jury found he "arm[ed] himself . . . spontaneously to repel[] an immediate danger." See id. at 386.

Preliminarily, we are satisfied a self-defense instruction would not have been appropriate for the unlawful weapons possession charge related to S.F. because, as we determined above, there was no testimony that S.F. was the aggressor or that self-defense would have been justified.[4]

Because the trial court instructed the jury regarding self-defense concerning the aggravated assault charge pertaining to J.M., its failing to charge self-defense to the section 5(d) charge as to J.M. presents a closer call. However, even assuming without deciding the trial court should have instructed the jury it could consider self-defense to that charge if it found defendant's justifiably and spontaneous armed himself with a knife to defend himself against J.M., we conclude any arguable error was harmless in light of the jury's rejection of self-defense and finding defendant guilty of aggravated assault of J.M., and not "clearly capable of producing an unjust result." See R. 2:10-2. The jury,

---

[4] We also note the only testimony regarding the origin of the knife came from S.F., who testified the knife used by defendant was silver with a black handle, she had never seen it before, and it did not come from her apartment, in which there had only ever been a borrowed green knife. She testified the silver and black knife was not hers, and the green knife "was the only knife in [the] apartment."

properly instructed as to self-defense regarding defendant's stabbing J.M., rejected that defense. Accordingly, defendant's claim the jury would have done otherwise if similarly instructed regarding self-defense in his possession of the knife lacks merit.

We next address defendant's arguments related to his convictions of possession of a weapon for an unlawful purpose. N.J.S.A. 2C:39-4(d) prohibits the "possession [of] any weapon, except a firearm, with a purpose to use it unlawfully against the person or property of another." The use of a weapon in self-defense is a lawful purpose when "motivated honestly by a self-protective purpose." See State v. Harmon, 104 N.J. 189, 207 (1986).

For the reasons already stated, we again reject any claim that a self-defense instruction would have been appropriate related to S.F. This argument needs no further discussion.

With respect to the applicability of self-defense to defendant's using the knife to stab J.M., we note S.L. never testified defendant told her he possessed the knife for a protective purpose or the circumstances under which he came into possession of it. Nonetheless, again we find no plain error, as even were we to assume the court should have instructed the jury regarding self-defense on this charge, its failure to do so was harmless and not "clearly capable of producing

22

an unjust result." See R. 2:10-2. Indeed, even when self-defense may be warranted to some degree, the force utilized by an actor in response must be commensurate and not greater than that force necessary to defend against the threat. See Model Jury Charges (Criminal), "Justification – Self Defense In Self Protection (N.J.S.A. 2C:3-4)" (rev. June 2011) ("The force used by the defendant must not be significantly greater than and must be proportionate to the unlawful force threatened or used against the defendant."); see also State v. Abbott, 36 N.J. 63, 68 (1961) (a claim of self-defense may fail "[i]f the force used was unnecessary in its intensity").

Here, the record contained no evidence supporting defendant's claim he was justified or held an honest belief he had to resort to taking a knife and stabbing repeatedly J.M. in both her stomach and face in order to protect his own safety. Notably, according to the testimony of those witnesses present at the time of the stabbings, J.M., in her own home, responded to S.F.'s call for help when defendant refused to leave and instead "charged" at S.F. knocking her to the ground. When J.M. attempted to free S.F., defendant stabbed her with a knife he held in his sleeve. On this record, we are satisfied S.L.'s characterization of defendant's admissions, even construed with all favorable inferences to defendant, did not suggest defendant honestly believed use of a

23

knife in this manner was justified.  We thus conclude the failure to instruct as to self-defense on this charge was not plain error.

C.

Defendant also argues the court did not adequately address the jury's inquiries regarding the distinction between "serious bodily injury" and "significant bodily injury."  Defendant concedes his trial counsel consented to the court's responses to all the jury questions at trial; thus, we review for plain error.  See State v. Gorthy, 226 N.J. 516, 540-41 (2016) (a trial court's responses to a jury's questions, unchallenged at the time, are reviewed for "plain error").

As here, "[w]hen a jury requests clarification, a trial judge 'is obligated to clear the confusion.'"  State v. Berry, 254 N.J. 129, 145-46 (2023) (quoting State v. Savage, 172 N.J. 374, 394 (2002)).  Further, "the trial judge is obliged to answer jury questions posed during the course of deliberations clearly and accurately and in a manner designed to clear its confusion, which ordinarily requires an explanation beyond rereading the original charge" and a "court's failure to do so may require reversal."  Id. at 146 (quoting Pressler & Verniero, Current N.J. Court Rules, cmt. 7 on R. 1:8-7 (2023)).  The inquiry is whether the court's response was "inadequate to guide the jury in the course of its deliberations."  See Savage, 172 N.J. at 395.

24

Here, the court received only one note containing the three separate questions: "If this was a domestic relation, do we have to go to 1(c)?"; (2) "Does relationship status define 1(b) versus 1(c)?"; and (3) "What is the distinction between 4(a) and 4(b)?" Importantly, defendant does not assert the court ever provided incorrect statements of law. Nor could he.

The first two questions pertained to the process for moving through the lesser-included offenses on the verdict form. The court correctly advised the jury it should only proceed to the lesser-included offense questions if it had already unanimously agreed defendant was not guilty of the greater charged offense, stating: "You should only be at 1(c) if you have already decided unanimously that 1(a) is not guilty and 1(b) is not guilty." This comported with the model charge and the verdict sheet and were in no manner inaccurate.

To the final question, the court responded:

> So, in your charges I explain what serious bodily injury is. If you find him guilty on the question, you don't go to 4(b). You would be moving to count five.
>
> If you find him not guilty then you would move to 4(b) and the difference with 4(b) is significant bodily injury. Remember so there's two different charges, and referring to the charges that you have in the back, what constitutes serious bodily injury and what constitutes significant bodily injury.

25

So, 4(b) you would only get to that question if you found him not guilty on 4(a). Hopefully I've answered the questions as best as I could. If I haven't, feel free to send out another note.

Indeed, the only meaningful difference between 4(a) and 4(b) is the level of injury required—"serious" versus "significant"—which the court defined explicitly in accordance with the model charge. See Model Jury Charges (Criminal), "Aggravated Assault – Serious Bodily Injury (N.J.S.A. 2C:12-1b(1))" (rev. May 2005); Model Jury Charges (Criminal), "Aggravated Assault – Significant Bodily Injury (N.J.S.A. 2C:12-1b(7))" (2011).

N.J.S.A. 2C:11-1 provides the key definitions:

a. "Bodily injury" means physical pain, illness or any impairment of physical condition;

b. "Serious bodily injury" means bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ;

. . . .

d. "Significant bodily injury" means bodily injury which creates a temporary loss of the function of any bodily member or organ or temporary loss of any one of the five senses.

The court defined each for the jury; we perceive no error or need to elaborate because the jury was equipped with these detailed definitions.

26

Additionally, in responding, the court instructed the jury three separate times to send a follow-up note if any confusion persisted or its questions remained unanswered. The jury posed no further inquiries and rendered its verdict the following day. We detect no indication the jury's questions remained and conclude the court's responses were sufficient and appropriate "to guide the jury in the course of its deliberations."

D.

Defendant next argues J.M.'s testimony regarding her treating physician's statements concerning the severity and permanency of her injuries amounted to "impermissible hearsay." He contends the admission of such testimony despite the absence of an objection was "plain error" and "capable of producing an unjust result." Acknowledging the statements were hearsay, the State contends their admission was not plain error.

When "no objection was advanced with respect to [the] hearsay evidence [introduced] at trial, it must be judged under the plain-error standard." State v. Canfield, 470 N.J. Super. 234, 331 (App. Div. 2022) (alterations in original) (quoting State v. Frisby, 174 N.J. 583, 591 (2002)) (internal quotation marks omitted); see also State v. Taylor, 350 N.J. Super. 20, 32 (App. Div. 2002). Significantly, "when counsel does not make a timely objection at trial, it is a

27

sign that defense counsel did not believe the remarks were prejudicial when they were made" and "[t]he absence of objections weighs against [the] defendant's claim that errors were clear or obvious" as "[i]t [is] fair to infer from the failure to object below that in the context of the trial the error was actually of no moment." Canfield, 470 N.J. Super. at 332 (all but the first alteration in original) (first quoting State v. Pressley, 232 N.J. 587, 594 (2018); then quoting State v. Nelson, 173 N.J. 417, 471 (2002)) (internal quotation marks omitted). Relevant here, the admission of hearsay can constitute plain error only if it "was a critical piece of evidence to the State and was not cumulative." State v. Briggs, 279 N.J. Super. 555, 565 (App. Div. 1995) (directing consideration of whether "the weaknesses in the evidence was such as to have 'appreciably tipped the credibility scale'" (quoting State v. W.L., 278 N.J. Super. 295, 301 (App. Div. 1995))); see also State v. Branch, 182 N.J. 338, 353-54 (2005) (finding the admission of hearsay evidence to be "plain error" where it "was a close case" and the hearsay testimony "may have tipped the scales").

Here, we recognize the hearsay statements from J.M.'s doctor concerning J.M.'s injuries were probative of their severity and permanency. J.M. advised the jury the doctor told her the lining of her stomach had been punctured and her scars and bowel impairments were permanent. We further acknowledge "under

28

the Code's definition of 'serious bodily injury' not every stabbing will result in such injury." State v. Sloane, 111 N.J. 293, 295, 298-99 (1988) (noting a victim who "was stabbed first through the arm and then in the back" could have been found to have sustained either serious or significant injury and the jury should have been charged as to both offenses); see, e.g., State v. Kane, 335 N.J. Super. 391, 399 (App. Div. 2000) (a "broken nose" without any "indicati[on] that the victim's condition was protracted, prolonged or extended in time" did not constitute "serious bodily injury").

However, even excluding these hearsay statements from her doctor, the record contained ample evidence upon which a jury could have concluded J.M. suffered serious bodily injury. J.M. testified she underwent emergency surgery to her face and abdomen which required hospitalization and left her with lasting scars. The jury saw photos of her injuries and the bloody scene, and J.M. personally described the ferocity of the attack. J.M. described the persisting effects of the stabbing as she testified almost two years after the attack. She described her ongoing bowel issue and scarring. That the doctor told her she was stabbed could have no bearing on a record otherwise teaming with references and evidence J.M. had been stabbed. Thus, we cannot conclude the

admission of hearsay statements was "of such a nature as to have been clearly capable of producing an unjust result." See Canfield, 470 N.J. Super. at 331.

E.

Finally, we consider and reject defendant's argument the court's admission, over defendant's objection, of the twelve-minute excerpt from the responding officer's BWC footage in which he tended to S.F.'s wounds was "unduly prejudicial and harmful error." Defendant asserts the video "linger[ed] on scenes of blood and graphic images," which was cumulative of "[o]ther evidence . . . presented to establish S.F.'s injuries following the incident, including photographs and testimony from her treating physician."

Generally, "[w]e review the trial court's evidentiary ruling 'under the abuse of discretion standard because, from its genesis, the decision to admit or exclude evidence is one firmly entrusted to the trial court's discretion.'" State v. Williamson, 246 N.J. 185, 198-99 (2021) (quoting State v. Prall, 231 N.J. 567, 580 (2018)). "Under that deferential standard, we review a trial court's evidentiary ruling only for a 'clear error in judgment.'" State v. Medina, 242 N.J. 397, 412 (2020) (quoting State v. Scott, 229 N.J. 469, 479 (2017)). "An appellate court applying this standard should not substitute its own judgment for that of the trial court, unless 'the trial court's ruling was so wide of the mark that

30

a manifest denial of justice resulted.'" State v. Perry, 225 N.J. 222, 233 (2016) (quoting State v. Marrero, 148 N.J. 469, 484, (1997)) (excess internal quotation marks omitted). "An evidentiary error will not be found 'harmless' if there is a reasonable doubt as to whether the error contributed to the verdict." State v. J.R., 227 N.J. 393, 417 (2017) (quoting State v. McLaughlin, 205 N.J. 185, 211-12 (2011)).

Pertinent here, N.J.R.E. 403 provides:

> Except as otherwise provided by these rules or other law, relevant evidence may be excluded if its probative value is substantially outweighed by the risk of:
>
> (a)   Undue prejudice, confusion of issues, or misleading the jury; or
>
> (b)   Undue delay, waste of time, or needless presentation of cumulative evidence.

In reviewing claims of "undue prejudice," "the inquiry . . . is whether the probative value of the evidence 'is so significantly outweighed by [its] inherently inflammatory potential as to have a probable capacity to divert the minds of the jurors from a reasonable and fair evaluation of the' issues." State v. Cole, 229 N.J. 430, 448 (2017) (alteration in original) (quoting State v. Thompson, 59 N.J. 396, 421 (1971)).

We have reviewed the video and the court's determination and discern no abuse of discretion. The court reasonably determined the video, already

31

shortened by the State, with audio muted, was not "overly prejudicial" or impermissibly duplicative of other evidence.

Although images of S.F.'s bleeding wounds are visible in the video, the injuries are depicted as responders attend to her, at times obstructing the injuries from view. Several officers apply bandages, cut S.F.'s clothes, and apply pressure to her multiple wounds. The recording at times captures the officers and the surrounding scene, as the BWC is not continuously focused on the injuries. Additionally, J.M. is seen for only a few seconds, from a few yards away, lying on the floor.

Distinct from photographs of the crime scene, images of S.F.'s injuries, and her surgeon's testimony, the BWC footage shows the immediate aid S.F. needed from responding officers. As the trial court noted, defendant was charged with attempted murder of S.F., making the extent of her injury, particularly her blood loss and the seriousness of her injury, central to consideration of that offense, which requires proof of defendant attempting to purposely or knowingly "cause[] death or serious bodily injury resulting in death." See N.J.S.A. 2C:11-3(a)(1), (2).

Further, testimony from S.F.'s surgeon suggested S.F. might have bled to death if not for the emergency care she received from the responding officers at

32

the scene. Thus, the extent to which first responders intervened to stop S.F.'s bleeding was probative of the seriousness of S.F.'s injuries, and we are satisfied that value was not "significantly outweighed by its inherently inflammatory potential."

Even were we to assume for purposes of argument the video length was excessive, we are convinced any arguable error in that regard did not rise to the level of reversible error or contribute unduly to the verdict. See J.R., 227 N.J. at 417. Notably, the jury found defendant not guilty of attempted murder despite the video's admission and other evidence, including S.F.'s surgeon's opinions of her injuries. Therefore, we are satisfied no arguable error warrants reversal on this basis.

F.

Defendant contends the cumulative effect to these errors deprived him of a fair trial and warrant the reversal of his conviction. In light of our decision discerning no arguable errors of "such magnitude as to . . . render[] the trial unfair," see State v. Orecchio, 16 N.J. 125, 129 (1954); see also State v. Wakefield, 190 N.J. 397, 538 (2007), we likewise reject this claim in the aggregate. "A defendant is entitled to a fair trial but not a perfect one." State v. R.B., 183 N.J. 308, 334 (2005) (quoting Lutwak v. United States, 344 U.S. 604,

619 (1953)).  Here, the evidence against defendant was strong and included victim and eyewitness testimony, medical testimony, and photographs of the crime scene and defendant's car, as well as his admission to stabbing the victims. We conclude defendant received a fair trial.

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division